# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 24, 2008

Charles R. Fulbruge III
Clerk

No. 05-41265

UNITED STATES OF AMERICA,

                                        Plaintiff - Appellee,

v.

MARIA DE JESUS-OJEDA, JOSE GERONIMO-MENDEZ,

                                        Defendants - Appellants.

Appeals from the United States District Court
for the Southern District of Texas

Before GARWOOD, DENNIS, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

Based on the facts of this case, it was foreseeable by participants in an unlawful alien smuggling scheme conducted in South Texas in August that others involved in the endeavor would take the aliens on foot through brush and hostile terrain and that death or serious bodily injury might result. The district court did not err in applying sentencing enhancements under U.S.S.G. § 2L1.1(b)(5) and (6),[1] and the evidence was sufficient to support the jury's findings. Because the remaining challenges raised in this appeal have no merit, we affirm the convictions and sentences.

---

[1] U.S. SENTENCING GUIDELINES MANUAL § 2L1.1(b)(5) & (6) (2004).

I

A five-count superseding indictment charged five defendants with violations of 8 U.S.C. § 1324(a)(1). Three of the defendants entered into plea agreements. Jose Geronimo-Mendez and Maria De Jesus-Ojeda proceeded to trial before a jury, were found guilty on all counts, and are the appellants in this appeal. De Jesus-Ojeda was in deportation proceedings at the time of her trial. The other four defendants were unlawful aliens.

It was alleged that defendants De Jesus-Ojeda, her nephew, Sergio Miguel Sanchez-Ojeda, Geronimo-Mendez, Edgar Hernandez-Velasquez, and Tirso Castillo-Arreola engaged in smuggling, transporting and harboring unlawful aliens from July 23, 2003 to on or about August 3 of the same year. The evidence at trial reflects that in July and August of 2003, Gregoria Yaneth Escobar-Solis was 17 years old and a native of Guatemala. Her family paid to have her smuggled into the United States. Escobar-Solis traveled through Mexico, was led to the home of Dona Oralia in Mexico, and was subsequently delivered by Oralia to Geronimo-Mendez.

Geronimo-Mendez drove Escobar-Solis and other aliens to his home in Mexico, where they remained for two days. Geronimo-Mendez then led the group to a river bordering the United States (presumably the Rio Grande), but the aliens were arrested and jailed before they could cross. Escobar-Solis was deported from Mexico to Guatemala. A week later, Escobar-Solis took the same route to Mexico and returned to Geronimo-Mendez's home. He again drove her and others to the river bordering the Unites States. He put Escobar-Solis and two other women in and on an inner tube from a car tire and towed them across the river. Escobar-Solis could not swim, was not given a life vest or jacket, and the water was too deep for her feet to touch the bottom.

Another unlawful alien, Rufino Zarceno-Linares, testified that Geronimo-Mendez similarly led him to the Rio Grande river to cross into the United States

in this same time-frame. Zarceno-Linares could swim well and tried to touch the bottom of the river but was unable to do so. Zarceno-Linares testified that Geronimo-Mendez pulled an inner tube with two girls hanging onto it across the river. None of the aliens had life vests or jackets.

Escobar-Solis testified that after crossing the river, Geronimo-Mendez led the group on foot for about 30 minutes. He then directed them to hide in the brush, while he left to make a telephone call. A vehicle subsequently arrived, and it took Geronimo-Mendez and the aliens to a "stash house" where there were an additional 20 to 25 unlawful aliens. They stayed at the "stash house" in Harlingen, Texas for about a week, and Escobar-Solis met other smugglers there including Hernandez-Velasquez, Castillo-Arreola, and Sanchez-Ojeda. Sanchez-Ojeda asked her for the name and contact information of relatives in the United States, and he told her to call them and ask them to send money to "Maria." Escobar-Solis's aunt sent $600 to Maria De Jesus-Ojeda in San Benito, Texas (about five miles southeast of Harlingen) on July 25, 2003 through Western Union. De Jesus-Ojeda received 23 other Western Union money transfers in July 2003, and seven of these payments were received on July 25, 2003. (From April 2, 2002 through July 31, 2003, Maria De Jesus-Ojeda received 38 Western Union payments totaling $28,175.)

Geramino-Mendez took Zarceno-Linares to the same stash house to which he had taken Escobar-Solis, and Zarceno-Linares likewise stayed for about a week and met Hernandez-Velasquez, Castillo-Arreola, and Sanchez-Ojeda. Sanchez-Ojeda similarly asked Zarceno-Linares for the names of relatives in the United States who would send payment, and Sanchez-Ojeda directed those relatives to wire $600 to Maria De Jesus-Ojeda. She received that payment on July 25, 2003. While at this location, Zarceno-Larines became friendly with Jose Martin Martinez-Campos, an 18-year-old unlawful alien who would later perish from dehydration or exposure, or both, in the South Texas brush.

At the end of their week's stay, Zarceno-Linares, Escobar-Solis, and at least 14 other aliens, including Martinez-Campos, were driven from the stash house in Harlingen to a hotel, and the following day, they were driven to the edge of brush located south of a Customs and Border Patrol Checkpoint on Farm-to-Market Road 1017 near Hebbronville, Texas, which is northwest of Harlingen, in the interior of Texas.[2]  The aliens were guided into the South Texas brush by Hernandez-Velasquez and Castillo-Arreola.  It was August 1 or 2, 2003.  The group of 18 (including the two guides) had six gallons of water.

On the first leg of their journey, they walked at night, from about 7:00 p.m. until about 3:00 a.m., and then slept until later in the morning. When they started walking again that morning, they were out of water.  By 1:00 p.m., all of the aliens were complaining of the lack of water and were feeling ill.  Hernandez-Velasquez and Castillo-Arreola brought about three more gallons of water for the group, but the day was hot (at least 98 and perhaps up to 104 degrees), and that supply was soon exhausted.

Martinez-Campos was ill even before they began walking through the brush, and at some point during the trek on the second day, he fainted.  Two of the aliens carried him on.  Another alien was ill and had trouble walking, and eventually he was unable to walk and was assisted by other aliens.  While proceeding through the brush, Escobar-Solis and Zarceno-Linares knew they were near a road, because they could hear cars passing nearby.  Hernandez-Velasquez and Castillo-Arreloa told the group to press on through the brush in spite of the heat and lack of water.

The group eventually reached a windmill where they were able to drink. While at the windmill, the guides saw a white vehicle coming toward them and told the aliens to run and to hide in the brush.  Two of the aliens carried

---

[2] Hebbronville is approximately 128 miles from Harlingen if traveling on a highway.

Martinez-Campos into the brush with them. Some of the aliens, including Escobar-Solis and Zarceno-Linares, communicated their concern about Martinez-Campos to the guides. Initially, the guides refused any aid, but at some point they used a cell phone to call Sanchez-Ojeda and request a car. However, Martinez-Campos died before it arrived. Zarceno-Linares was with Martinez-Campos when he died and could hear cars driving not far from that site.

The unlawful aliens asked the guides to carry Martinez-Campos's body to the road, but they declined, saying his corpse was too heavy. One of the guides spoke to Sanchez-Ojeda, apparently a leader of the smuggling group, by cell phone and was told to leave Martinez-Campos's body in the brush. Zarceno-Linares wrapped Martinez-Campos's body in a hotel sheet. About an hour after Martinez-Campos had died, the car the guides had summoned arrived, and it took the group about five minutes to walk from where his body was left to the side of the road. They were picked up in small groups and transported to more brush near a ranch. The guides told the aliens to stay in the brush, then left, saying they would return with food and water.

At his point, it was about 5:00 or 6:00 p.m., and the aliens remained hiding in the brush through that night and all of the next day. The guides did not return for them. The aliens had no food or water. Some of the aliens left, found water, and returned to the others. Eventually, Escobar-Solis and four others went to a nearby road and surrendered to Border Patrol agents, telling them that others were in the brush. The authorities found all but Zarceno-Linares, who successfully remained hidden. After a few days, he went to the nearby road and hitch-hiked to Dallas. He contacted immigration officials there, told them about Martinez-Campos, and led them to Martinez-Campos's body. It was where it had been left, which was one-third of a mile from Farm-to-Market road 1017, in an area near the Border Patrol Check Point.

In the meantime, when Escobar-Solis was arrested after walking to the road close to where Martinez-Campos's body lay, she told the authorities to whom she surrendered that she was from Mexico. She was deported to that country with the other aliens with whom she had been arrested after coming out of the brush. Hernandez-Velasquez accompanied that group to Mexico. Two or three days later, the group was moved by smugglers to a hotel and again met Geronimo-Mendez. The aliens told him that they had been caught, deported to Mexico, and that Martinez-Campos had died.

Geronimo-Mendez then took only Escobar-Solis back to his house in Mexico where another man and woman, also seeking unlawful entry into the United States, were present. For a third time, with full knowledge of Escobar-Solis's ordeal and Martinez-Campos's death, Geronimo-Mendez guided Escobar-Solis across the river between Mexico and the United States and hid her and the other two aliens in brush. A van subsequently arrived, and as Geronimo-Mendez was placing the aliens into it, authorities appeared and arrested all of them.

The Nueces County medical examiner testified that he saw approximately ten to twelve cases each year in which an illegal alien would die from dehydration or heat exhaustion while trying to evade a checkpoint by traveling on foot through the brush. There was evidence from immigration agents that unlawful aliens were frequently guided through the brush, attempting to skirt three Border Patrol checkpoints in this area of South Texas, including the one on Farm-to-Market Road 1017 near Hebbronville.

The jury convicted De Jesus-Ojeda and Geronimo-Mendez. At the sentencing stage of proceedings regarding Geronimo-Mendez, the probation officer grouped the five counts and fixed a base offense level of 12 for a violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I). The officer held Geronimo-Mendez responsible for 19 illegal aliens, and increased the offense level by 3 pursuant to U.S.S.G.

§ 2L1.1(b)(2)(A).[3] The officer increased the offense level to 18 pursuant to § 2L1.1(b)(5) on the basis that "the offense involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person."[4] An additional 8 levels was added pursuant to § 2L1.1(b)(6)(4) because the probation officer determined that Geronimo-Mendez's actions contributed to the death of one unlawful alien,[5] resulting in a total offense level of 26. Geronimo-Mendez's 5 criminal history points placed him in criminal history III, resulting in an advisory Guidelines sentencing range of 78 to 97 months. The district court sentenced him to 97 months of imprisonment for each of the five counts, to be served concurrently, and five years supervised release.

With regard to De Jesus-Ojeda, the probation officer similarly grouped the five counts and fixed a base offense level of 12 for a violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I). The officer recommended that De Jesus-Ojeda be held responsible for 29 illegal aliens, and increased the offense level by 6 pursuant to U.S.S.G. § 2L1.1(b)(2)(B).[6] The probation officer determined that De Jesus-Ojeda could have reasonably foreseen the danger posed by the conditions under which the aliens were transported and increased her offense level by 2 pursuant to U.S.S.G. § 2L1.1(b)(5).[7] An additional 8 levels was added pursuant to § 2L1.1(b)(6)(4) because the probation officer determined that De Jesus-Ojeda's actions contributed to the death of one unlawful alien.[8] De Jesus-Ojeda's total

---

[3] U.S. SENTENCING GUIDELINES MANUAL § 2L1.1(b)(2)(A) (2004) (providing that the level should be increased by 3 for smuggling, transporting, or harboring 6-24 unlawful aliens).

[4] Id. § 2L1.1(b)(5).

[5] Id. § 2L1.1(b)(6)(4).

[6] Id. § 2L1.1(b)(2)(B) (providing that the level should be increased by 6 for smuggling, transporting, or harboring 25-99 unlawful aliens).

[7] Id. § 2L1.1(b)(5).

[8] Id. § 2L1.1(b)(6)(4).

offense level was 28, and her criminal history category was II, resulting in an advisory Guidelines sentencing range of 87 to 108 months. The district court sentenced her to 95 months of imprisonment on each of the five counts, to be served concurrently, and three years supervised release.

De Jesus-Ojeda challenges only her sentence. She contends that an enhancement under section 2L1.1(b)(5) for an "offense involv[ing] intentionally or recklessly creating a substantial risk of death or serious bodily injury to anther person" should not have been applied because she did not create any risk of injury and it was not foreseeable that others involved in the offense would do so. For the same reasons, she contends that the district court erred in applying an enhancement under section 2L1.1(b)(6)(4) for the death of Martinez-Campos.

Geronimo-Mendez does not challenge the district court's construction or application of the advisory Sentencing Guidelines. His arguments are based on his construction of 8 U.S.C. § 1324(a)(1)(B)(iii) and (iv). He contends that the evidence is insufficient to support the jury's findings of aggravating factors in connection with the first three counts of the superseding indictment and therefore his conviction.

We turn first to De Jesus-Ojeda's contentions.

II

Maria De Jesus-Ojeda does not challenge any aspect of her conviction on five counts. She complains only of her sentence and contends that the district court erred in applying an enhancement under U.S.S.G. § 2L1.1(b)(5) and an enhancement under 2L1.1(b)(6)(4) because, she asserts, neither the creation of a substantial risk of death or serious bodily injury nor the death of Martinez-Campos was foreseeable to her.

A

The government contends that De Jesus-Ojeda did not assert her foreseeability arguments in the district court and that our review should be for

8

plain error. We disagree, but conclude that even under the more exacting standard of review for issues that are not forfeited, the sentence should be affirmed.

De Jesus-Ojeda did not use the word "foreseeable" in her objections to the pre-sentence report prepared by the probation officer or in her objections at her sentencing hearing. However, she argued that she participated only in receiving Western Union payments, which she gave to her nephew Sanchez-Ojeda. She asserted that she did not "knowingly participate" in the alien smuggling scheme and therefore that she should not be held responsible for sentencing purposes for the acts of the other dedendants. She contended that she did not intentionally or recklessly create a substantial risk of serious bodily injury or death and that none of her overt acts led to the death of Martinez-Campos. She also pointed out that there was no evidence that she received any payment from the alien who perished, Martinez-Campos, from his family, or otherwise on his behalf.

The probation officer's pre-sentence report concluded that alien smuggling is inherently dangerous by its very nature, and that the checkpoints at Falfurrias, Hebbronville, and Sarita, Texas, which smugglers often seek to circumvent, are surrounded by dry, hostile terrain. The district court adopted the PSR and reasoned at De Jesus-Ojeda's sentencing hearing that she was "responsible" for "placing [Martinez-Campos] in the hands of traffickers that, you know, led up to this young man's death." The district court also stated that De Jesus-Ojeda

> knew what was eventually going to happen in that month of August. People transport – who are being transported and the means by which they are ordinarily transported in this area – in this geographic area that is very arid and very hot weather [sic] during that time of year. So I find that she should be held accountable for those – for the resulting death of Jose Martin Martinez-Campos in the same way as someone who was actually there. . . .

When complaints are preserved in the district court for appeal, we review the district court's interpretation and application of the Sentencing Guidelines de novo and its factual determinations for clear error.[9]  We have held that in reviewing an application of a sentencing enhancement under the Guidelines, "a district court is permitted to draw reasonable inferences from the facts, and these inferences are fact-findings reviewed for clear error as well,"[10] and that "[w]e will uphold a district court's factual finding on clear error review so long as the enhancement is plausible in light of the record as a whole."[11]  Had De Jesus-Ojeda failed to preserve error, our review would be for plain error,[12] and De Jesus-Ojeda would be required to demonstrate a reasonable probability that, but for the error, she would have received a lesser sentence in order to show that her substantial rights were affected.[13]

B

We first consider whether the district court erred in applying a 2-level enhancement under U.S.S.G. § 2L1.1(b)(5) in determining the advisory sentencing guideline range applicable to Maria De Jesus-Ojeda.  She contends that she had no knowledge of the methods that would be used to transport the aliens and therefore, the risks created by others involved in the scheme were not reasonably foreseeable to her.  She additionally contends that the gross

---

[9] United States v. Solis-Garcia, 420 F.3d 511, 513-14 (5th Cir. 2005).

[10] United States v. Caldwell, 448 F.3d 287, 290 (5th Cir. 2006) (citing United States v. Rodriguez, 897 F.2d 1324, 1326 (5th Cir.1990)).

[11] Id. (citing United States v. Gonzales, 436 F.3d 560, 584 (5th Cir. 2006)).

[12] See United States v. Olano, 507 U.S. 725, 732 (1993) ("There must be an 'error' that is 'plain' and that 'affect[s] substantial rights.'  Moreover, Rule 52(b) leaves the decision to correct the forfeited error within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"") (citing United States v. Young, 470 U.S. 1, 15 (1985) (quoting United States v. Atkinson, 297 U.S. 157, 160 (1936))).

[13] United States v. Villegas, 404 F.3d 355, 364 (5th Cir. 2005).

negligence of the two guides created the risk of bodily injury, and their gross negligence was a superseding cause that could not have been reasonably foreseen by her.

Her latter contention is patently insupportable. If gross negligence is always a superseding cause, and therefore forecloses foreseeability, then subsection (b)(5) would rarely, if ever, apply to any defendants other than those who actually "intentionally or recklessly creat[ed] a substantial risk of death or serious bodily injury to another person."[14] Reckless conduct is generally equivalent to gross negligence, and intentional conduct would seemingly provide an even more compelling reason to invoke "superseding cause." But it is clear that this is not what the Guidelines contemplate. The commentary to U.S.S.G. § 1B1.3 addresses relevant conduct and directly dispatches De Jesus-Ojeda's argument:

> Note that the criminal activity that the defendant agreed to jointly undertake, and the reasonably foreseeable conduct of others in furtherance of that criminal activity, are not necessarily identical. For example, two defendants agree to commit a robbery and, during the course of that robbery, the first defendant assaults and injures a victim. The second defendant is accountable for the assault and injury to the victim (even if the second defendant had not agreed to the assault and had cautioned the first defendant to be careful not to hurt anyone) because the assaultive conduct was in furtherance of the jointly undertaken criminal activity (the robbery) and was reasonably foreseeable in connection with that criminal activity (given the nature of the offense).[15]

Our focus, then, is on whether the reckless conduct in taking the unlawful aliens into the South Texas brush during August with inadequate water supplies was reasonably foreseeable in connection with the criminal activity in which De

---

[14] U.S.S.G. § 2L1.1(b)(5).

[15] Id. § 1B1.3 n.2.

11

Jesus-Ojeda agreed to participate. We conclude, based on the facts of this case, that it was.

De Jesus-Ojeda personally received payments for the smuggling of 24 unlawful aliens during July 2003. It was reasonably foreseeable by her, as the district court found, that the smuggling of the aliens would occur during the summer. It is true that there is no evidence that De Jesus-Ojeda knew precisely how the smuggling, transporting, and harboring would occur, but given the nature of unlawful alien smuggling operations in the area of Texas in which the offenses for which she was convicted occurred, the methods used by those in concert with her were reasonably foreseeable. There was evidence that aliens are frequently moved on foot through the hostile terrain surrounding the Border Patrol Checkpoints in this part of South Texas to avoid detection. It is not unforeseeable that when this occurs in the hot summer months, heat exhaustion may occur, even if adequate water supplies are provided. It is also foreseeable that aliens traveling on foot may not be able to carry enough water to sustain them throughout the trip, or that the smugglers may give them inadequate water supplies along the way. There was evidence that ten or twelve illegal aliens die in the brush in this area each year while attempting to avoid detection entering this country. Methods such as those used by others involved in the plan or scheme jointly undertaken with De Jesus-Ojeda are all too common in the geographic areas including and surrounding Harlingen, San Benito, Hebbronville, Falfurrias, and Sarita.

The fact that all of De Jesus-Ojeda's co-conspirators were themselves unlawful aliens in the United States increased the foreseeability that they would use methods designed to avoid contact with Border Control Checkpoints, methods that might well include walking through the brush and hostile terrain. The district court did not err in concluding that De Jesus-Ojeda could be held

accountable under U.S.S.G. § 2L1.1(b)(5) for her cohorts' reckless or intentional creation of a substantial risk of death or serious bodily injury.

C

With regard to the applicability of U.S.S.G. § 2L1.1(b)(6),[16] De Jesus-Ojeda makes the same arguments just considered above, and we reject them for the same reasons. Even if foreseeability is required before this enhancement may be applied, an issue we do not decide, it was foreseeable that serious bodily injury or death might occur during the smuggling, transporting, and harboring of the aliens in light of the nature of the particular offenses in which De Jesus-Ojeda participated, as outlined above. The district court did not err in applying an eight level enhancement under U.S.S.G. § 2L1.1(b)(6).

III

The jury found Geronimo-Mendez guilty as charged in all five counts of the superseding indictment. In connection with each of the first three counts, the jury further found that "during and in relation to" each violation, Geronimo-Mendez "caused serious bodily injury to at least one alien," "placed in jeopardy the life of at least one alien," and that a "person died as a result of the conduct." It is apparently Geronimo-Mendez's position on appeal that these findings are referable to 8 U.S.C. § 1324(a)(1)(B)(iii) and (iv), and that the evidence is insufficient to support the jury's findings. Although Geronimo-Mendez concedes

---

[16] U.S.S.G. § 2L1.1(b)(6) provides:

If any person died or sustained bodily injury, increase the offense level according to the seriousness of the injury:

| Death or Degree of Injury | Increase in Level |
|---|---|
| (1) Bodily Injury | add 2 levels |
| (2) Serious Bodily Injury | add 4 levels |
| (3) Permanent or Life-Threatening Bodily Injury | add 6 levels |
| (4) Death | add 8 levels. |

there is sufficient evidence to sustain a conviction for violating 8 U.S.C. § 1324(a)(1)(A)(v), he asserts that "the enhancement portions of the indictment are not supported by sufficient evidence" because it was unforeseeable that his co-conspirators would place an alien in danger of serious bodily injury or cause the death of an alien. He argues that "the 'during and in relation to'" language of 8 U.S.C. § 1324(a)(1)(B)(iii) and (iv) "does not by itself create responsibility merely on its own, even in a conspiracy."[17]

The government states in its brief that it interprets Geronimo-Mendez's sufficiency challenge "as a complaint that the district court erred in applying the enhancements under U.S.S.G. §§ 2L1.1(b)(5) and 2L1.1(b)(6)(4)." However, the government states in its brief that the aggravating factors, which authorize increased statutory maximum penalties, must be submitted as elements of the offense if charged in the indictment and submitted to a jury and proved beyond a reasonable doubt, citing this Circuit's decision in United States v. Williams,[18] and the Supreme Court's decision in Apprendi v. New Jersey.[19]

We need not resolve whether jury findings as to the aggravating elements were required, and because Geronimo-Mendez does not challenge the district court's interpretation or application of the advisory Sentencing Guidelines, we do not address any issues regarding the guidelines. Because Geronimo-Mendez frames his arguments with reference to the penalty provisions of 8 U.S.C. § 1324(a)(1)(B), we will address his complaint that the evidence is insufficient only in light of that statute. We note that the advisory sentencing guideline range found by the district court to apply to Geronimo-Mendez is less than the ten-year statutory maximum prison sentence authorized for a violation of 8

---

[17] As the government points out, the phrase "during and in relation to" appears in subsection (iii) but not subsection (iv).

[18] 449 F.3d 635, 644 & n.18 (5th Cir. 2006).

[19] 530 U.S. 466, 490 (2000).

U.S.C. § 1324(a)(1)(A)(v)(I) even when none of the aggravating factors are present.

Assuming, without deciding, that the enhanced penalty provisions in subsections (iii) and (iv) of 8 U.S.C. § 1324(a)(1)(B) have an element of foreseeability, as Geranimo-Mendez contends, there is sufficient evidence that serious bodily injury to and death of an unlawful alien was foreseeable by Geronimo-Mendez. There is also evidence that he directly placed the life of a person in jeopardy within the meaning of subsection (iii). As recounted earlier, Geronimo-Mendez personally placed Escobar-Solis and other women on and in an inner tube and pulled them across the Rio Grande at night in water over their heads. Escobar-Solis could not swim and was not given a life vest.

The record also reflects that Escobar-Solis told Geronimo-Mendez about her ordeal and Martinez-Campos's death after she was arrested and deported to Mexico and before he attempted to bring her into the United States a third time. The fact that Geronimo-Mendez continued his smuggling, transporting, and harboring aliens in the same mode after he learned of the conditions under which the prior group had been taken through the South Texas brush and Martinez-Campos's resulting death gives rise to at least a reasonable inference that he was aware of the risks that his co-conspirators were taking in carrying out their common smuggling venture and that severe injury or death to the aliens being smuggled and harbored was foreseeable to Geronimo-Mendez.

Additionally, the actions of the guides in leading the unlawful aliens through South Texas brush lands in August were foreseeable by Geronimo-Mendez for the same reasons they were foreseeable by De Jesus-Ojeda. There is sufficient evidence to support jury's findings.

IV

Geronimo-Mendez also claims the jury charge led to a non-unanimous verdict and that the Government needed to elect which events met the

15

qualification for culpability before jury deliberations. The jury was asked the following for each count and each defendant:

1. Do you, the jury, further unanimously find beyond a reasonable doubt that the offense was done for the purpose of commercial advantage or private financial gain?

2. Do you, the jury, further unanimously find beyond a reasonable doubt that during and in relation to said violation in Count [number]:

    a. The Defendant caused serious bodily injury to at least one alien?

    b. The Defendant placed in jeopardy the life of at least one alien?

    c. A person died as a result of the conduct?

During deliberations, the jury sent out a note asking, "We are confused as to the wording of number 2 (2a, 2b, 2c) on any given count. Must we be unanimous in our response of 'yes' or 'no'? Or, should our response be 'no,' if we are not unanimous in our response to the question?" The court replied that both findings of guilt and "yes–no" answers must be unanimous.

Geronimo-Mendez affirmatively stated that he had no objections to the district court's instructions. Accordingly, we review the instructions for plain error.[20] Plain error review requires that Geronimo-Mendez show (1) there is an error (2) that it is clear and obvious and (3) that it affects his substantial rights.[21] Geronimo-Mendez asserts that the jury instructions fail to require a unanimous verdict because the Government did not elect exactly which events qualified under questions 2a and 2b as causing serious bodily injury and placing

---

[20] United States v. Rubio, 321 F.3d 517, 523 (5th Cir. 2003).

[21] United States v. Calverly, 37 F.3d 160, 162-64 (5th Cir. 1994).

a life in jeopardy. The concern is that one group of jurors would find one event—such as towing the non-swimming aliens across the river in an inner tube—would qualify as dangerous conduct while another group of jurors would find that a different event—such as walking through the south Texas brush without adequate water in August—was the basis for answering "yes." Geronimo-Mendez points to the jury's question regarding the unanimity of "yes–no" answers as direct evidence that "the jury was confused as to what events should provide the basis for a 'yes' or 'no' response."

Geronimo-Mendez relies heavily on United States v. Gipson in which a jury verdict was not unanimous because a statute enumerated six prohibited acts—receiving, concealing, storing, bartering, selling, or disposing of a stolen vehicle—that would allow the jury to convict if each juror found the defendant had performed one of the acts.[22] Though a unanimous jury had each found as individuals that one of the acts occurred, there was a legitimate chance that the jurors disagreed about which of the six acts the defendant committed.[23] This court divided the statute into two conceptual groupings: receiving, concealing, and storing formed the first, and bartering, selling, and disposing formed the second.[24] Within each group, the acts were sufficiently alike so that if jurors agreed that any of the three acts occurred, the conviction was unanimous.[25] The verdict was overturned because the jury, as instructed, could have convicted the defendant even though there was significant disagreement as to the nature of his actions.[26]

---

[22] 553 F.2d 453, 458 (5th Cir. 1977).

[23] Id.

[24] Id.

[25] Id.

[26] Id. at 459.

17

The present case differs from Gipson. Here, the jury charge made three separate, distinct inquiries: 1) did Geronimo-Mendez cause serious bodily injury to at least one alien, 2) did he place the life of at least one alien in jeopardy, and 3) did a person die as a result of the conduct the jury found had occurred in connection with that particular count. The complaint is not that the charge itself opened the door to non-unanimity but that Geronimo-Mendez and his conspirators committed so many acts that would satisfy these requirements that the Government should be forced to "elect" one over the others. Our decision in Gipson does not require a charge to be granulated to the point that a jury must find which specific acts were committed in finding the commission of an offense. The jury instruction regarding the aggravating factors was likely proper, or at the least did not constitute clear and obvious error, and Geronimo-Mendez's conviction is therefore affirmed.

* * * * *

For the foregoing reasons, we AFFIRM the district court.