**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 19-20143

United States Court of Appeals
Fifth Circuit

**FILED**
January 15, 2020

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

DESMOND OLUWASEYI JACKSON,

      Defendant - Appellant

Appeal from the United States District Court
Southern District of Texas, Houston
U.S.D.C. No. 4:18-CR-511-1

Before STEWART, CLEMENT, and HO, Circuit Judges.

PER CURIAM:*

Defendant-Appellant Desmond Oluwaseyi Jackson timely appeals his sentence imposed by the district court for five counts of false use of a passport under 18 U.S.C. § 1543. Jackson challenges the district court's cross reference to the Sentencing Guideline for fraud, sentencing enhancement for the loss amount given the insufficiency of evidence, and addition of a term of supervised release at a subsequent sentencing hearing. We AFFIRM the district court's

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 19-20143

cross reference, loss amount enhancement, and the addition of the supervised-release term.

## I.

### Facts and Sentencing Proceedings

In August 2018, Jackson was indicted on five counts of knowingly using a falsified passport.

## A.

### Charged Conduct

These charges stem from a widespread fraudulent scheme involving falsified bank accounts, wire transfers containing Business Email Compromise ("BEC")[1] fraud proceeds, fraudulently leased property, and romance scams. The instances of fraudulent conduct begin in November 2017 and continue through May 2018.

The indictment detailed five instances where Jackson attempted to use a counterfeit Federal Republic of Nigeria passport, purporting to be David Ola Richman.    As David Ola Richman—a fictitious individual—Jackson successfully opened bank accounts at (1) Wells Fargo Bank, (2) Chase Bank, (3) Woodforest National Bank, and (4) First National Bank (collectively, the "Richman Accounts").  During the relevant time period, Jackson also leased a mailbox at a Postal Xpress store.

Jackson's coconspirators scammed victims into funding these accounts using wire transfers.  The BEC proceeds would remain in these repository accounts until Jackson transferred the funds to his coconspirators.  The money was obtained primarily through romance scams.  The romance scams were schemes in which coconspirators targeted victims through email or other

---

[1] The Federal Bureau of Investigation defines BEC as a sophisticated email fraud scheme contacting businesses and individuals to unlawfully obtain money.

No. 19-20143

electronic communications, assumed fake personas, and pretended to have romantic interest in the victims. The victims were then seduced via e-communications over several months and persuaded to wire money into the Richman Accounts. The Government interviewed five victims who wired money into these accounts, totaling $32,950.00. Upon receipt, Jackson would then transfer the monies to his collaborators and retain a portion for himself.

B.

Uncharged Conduct

While Jackson was not charged for the following conduct, the district court nonetheless relied on it in sentencing Jackson:

In its brief responding to Jackson's presentence investigation report (PSR) objections, the Government stated that Jackson opened an additional Compass Bank account under the Richman alias. Jackson also used another counterfeit passport in the name of Gibson Olarotimi Maxwell. Under this alias, Jackson opened accounts at a (1) Wells Fargo Bank; (2) Chase Bank; (3) Woodforest National Bank; (4) Bank of America; and (5) First National Bank (collectively, the "Maxwell Accounts"). Between each alias, 10 fraudulent accounts were opened. According to the Government, it estimates that victims (including the five interviewed) wired $389,252.79 of BEC proceeds to the Richman and Maxwell Accounts.

C.

PSR Calculation and Sentencing

When Jackson was arrested, he voluntarily admitted that he used the fraudulent passports to open these accounts. According to one of the arresting officers, Jackson admitted that he received the fake passports "from people outside of the country and [that] his role was to open up bank accounts and receive transfers and deposits from different frauds, keep a small portion, and then send the money to the people that he was working with." [ROA.168]

3

No. 19-20143

On November 19, 2018, Jackson pleaded guilty without a plea agreement. The district court accepted his guilty plea, found him guilty, and scheduled his sentencing for February 26, 2018.

The PSR recommended a sentence ranging from 24 to 30 months based on an offense level of 17. The PSR's calculation began with United States Sentencing Guideline ("USSG") § 2L2.2, which applies to passport fraud offenses. The PSR then applied a cross reference from USSG § 2L2.2(c)(1)(A). If the defendant used the fraudulent passport to commit a felony, this section sets the offense level at the greater of the passport offense itself or the underlying felony. Consequently, Jackson's base offense level was six because the cross reference was to a crime of fraud. Because of the cross reference, the PSR recommended a twelve-level enhancement based on the fraud involving nearly $400,000.00[2] and recommended another two-level enhancement for committing a fraud using sophisticated means. Lastly, the PSR adjusted the sentence downward three levels for acceptance of responsibility. This resulted in an offense level of 17.

Jackson objected to the section 2L2.2(c)(1)(A) cross reference for, inter alia, lack of evidence. The Government responded with documentary evidence that included text messages between Jackson and his coconspirators, and the summaries of the five victim interviews.

At sentencing, the district court overruled Jackson's objections and found the cross reference to be appropriate because Jackson's conduct in opening the bank accounts was "within the scope of the jointly undertaken criminal activity, was in furtherance of the criminal activity, and it was reasonably foreseeable to [Jackson] that the deposits into the accounts were the results of

---

[2] This figure represents the total amount of deposits transferred into the Richman and Maxwell Accounts.

No. 19-20143

fraud." Thus, the court adopted the PSR's calculation and verbally sentenced Jackson to 27 months of imprisonment. The court then read the special conditions of supervised release but did not announce the term of supervised release it was imposing.

An hour or so after the hearing adjourned, the district court called the case again for what the court called "a continuation of the sentencing hearing." Realizing that it had not announced the term of the release, the court stated that it "forgot to announce the term of supervised release[]" and sentenced Jackson to three years of supervised release. The court overruled the defense counsel's objection to this pronouncement.

Jackson timely appealed this sentence.

## II.

Jackson argues that the district court misapplied the Guidelines. He objects to the cross reference to fraud, the intended loss figure of $389,252.70 (which triggers a six-level enhancement), and the reconvening of the sentencing hearing to orally pronounce the supervised-release term (which was omitted at the initial hearing). As mentioned, Jackson objected to each issue at sentencing.

## A.

### The Court Correctly Applied the Cross Reference.

The first issue on appeal is the district court's cross reference to fraud, which has increased Jackson's imprisonment range from a 0-to-6-month term to a 24-to-30-month term. According to Jackson, the district court misapplied this cross reference because it failed to make a finding about the scope of the jointly undertaken activity.

This court reviews a district court's interpretation and application of the Guidelines, including any cross references and selection of the applicable sentencing guideline, de novo. *See United States v. Grant*, 850 F.3d 209, 219

(5th Cir. 2017); *United States v. Johnston*, 559 F.3d 292, 294 (5th Cir. 2009). This court reviews the district court's factual findings only for clear error. *See, e.g.*, *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008). Because this issue concerns whether Jackson's relevant conduct rises to that of a fraud cross reference, it is a "[a] factual finding on a sentencing factor [which] is not clearly erroneous so long as it is plausible in light of the record read as a whole." *United States v. Cessa*, 785 F.3d 165, 188 (5th Cir. 2015) (quoting *United States v. Alaniz*, 726 F.3d 586, 622 (5th Cir. 2013)).

Chapter 2 cross references[3] "shall be determined on the basis of" relevant conduct. *See* USSG § 1B1.3(a); *see also United States. v. Maseratti*, 1 F.3d 330, 340 (5th Cir. 1993) (noting that the Guidelines allow a district court "to hold a defendant accountable for all relevant conduct"). While Jackson pleaded guilty only to fraudulent use of a passport, "non-adjudicated offenses may be considered relevant conduct under the Guidelines." *United States v. Brummett*, 355 F.3d 343, 344 (5th Cir. 2003). Conduct is considered relevant when it is (1) within the scope of the jointly undertaken criminal activity, (2) in furtherance of that criminal activity, and (3) reasonably foreseeable in connection with that criminal activity, that occurred during the commission of the offense of conviction. *See* USSG § 1B1.3(a)(1)(B); *see also* USSG § 1B1.3, cmt. n.3; *United States v. De Jesus-Ojeda*, 515 F.3d 434, 442–43 (5th Cir. 2008).

Here, the jointly undertaken criminal activity is wire fraud. Jackson's core contention is that the district court already made a ruling that the scope of Jackson's agreement was simply to open the Richman and Maxwell Accounts, not to commit wire fraud. In turn, he claims that the court's finding

---

[3] The cross-reference provision here is USSG § 2L2.2(c), which applies if "the defendant used a passport or visa in the commission or attempted commission of a felony offense, other than an offense involving violation of the immigration laws." *See* USSG § 2L2.2(c)(1).

is insufficient because the court did not find that "the wire fraud was within the scope of Mr. Jackson's agreement." We disagree.

Limiting Jackson's participation only to opening accounts and transferring proceeds would certainly understate his involvement. The five victim interviews and Jackson's electronic communications demonstrate that his conduct was within the scope of the jointly undertaken criminal activity, *i.e.*, wire fraud. Jackson's admissions to the arresting officer suggest that he opened the accounts for the very purpose of receiving proceeds from fraud. Each identified victim stated that she wired money to the Richman Accounts and was scammed in the process of wiring her money. While Jackson did not have any interaction with these victims, they were aware of the Richman Account number in order to complete these wire transfers. As the accountholder, Jackson communicated the account information to his collaborators, facilitating the wire fraud. Without this account information, such funds could not be transferred, and the wire fraud could not have been perpetuated. This coincides with the district court's finding that opening these accounts was within the scope of the wire fraud and that, without Jackson, "there was no place to deposit the money or withdraw it from." While he was not committing fraud on the front end and targeting victims, Jackson was certainly the "linchpin."

Additionally, the chat transcripts support that Jackson, at the very least, intended to participate in these romance scams. While it is true that there is no evidence indicating that he requested monies from the victims, Jackson's conduct fits the profile of a romance scam. Jackson was posing as a soldier and would text certain messages to the victim to gain her trust (*e.g.*, "I never stopped thinking about you" and "I will talk to you later dear, I am off for patrol"). The correlation between his conduct and the conduct of those who harmed the five identified victims is undeniable.

No. 19-20143

In short, Jackson facilitated the fraudulent transfers from the identified victims by setting up accounts to receive the transfers, and he appears to have initiated a romance scam himself. Therefore, the schemes and fraudulent transfers were within the scope of the criminal activities Jackson agreed to participate in. *Cf. United States v. Evbuomwan*, 992 F.2d 70, 74 (5th Cir. 1993) ("To hold a defendant accountable for the crime of a third person, the government must establish that the defendant agreed to jointly undertake criminal activities with the third person, and that the particular crime was within the scope of that agreement.").[4] We therefore affirm the district court's cross reference to fraud.

## B.

The Court Did Not Commit Reversible Error in Calculating this Sentence.

In adopting the PSR's loss amount, the district court enhanced Jackson's offense level based on the PSR's loss amount of $389,252.79 under USSG § 2b1.1(b)(1)(G). This is the total amount of funds funneled through the Richman and Maxwell Accounts. Jackson objected to this calculation, arguing that the PSR contained insufficient evidence demonstrating that the entire $389,252.79 was BEC proceeds.

When the objection is preserved, we conduct a de novo review of sentencing calculations, and we review the district court's factual findings for clear error. *United States v. Velasco*, 855 F.3d 691, 693 (5th Cir. 2017); *United States v. Scott*, 892 F.3d 791, 796 (5th Cir. 2018) ("We review preserved

---

[4] We allowed Jackson to submit supplemental briefing on whether the district court committed plain error in considering uncharged instances of Jackson using the fraudulent passport to open bank accounts as "relevant conduct." Jackson concedes that he did not raise this issue in the district court. If this was error, it was not plain error. The government has provided a plausible argument that the cross reference to the fraud guideline permits the court to view the uncharged passport offenses as "relevant conduct" because they form part of the "common scheme or plan" to commit wire fraud. *See United States v. Hayes*, 358 F. App'x 685, 690 (7th Cir. 2009).

challenges to the sufficiency of the evidence de novo, but we are 'highly deferential to the verdict.'").

"Calculation of total [loss] funds is a factual finding, which need only be determined by a preponderance of the evidence, and is reviewed only for clear error." *United States v. Yassine*, 574 F. Appx. 455, 466 (5th Cir. 2014) (per curiam); *Cessa*, 785 F.3d at 188 (stating that "a factual finding on a sentencing factor is not clearly erroneous so long as it is plausible in light of the record") (quoting *Alaniz*, 726 F.3d at 622).

The initial PSR contained assertions that the loss amount should include all deposits between these two accounts. Jackson objected to the lack of evidence which prompted the Government to supplement the PSR with various text messages involving Jackson and interviews from the five fraud victims. This accounted for $32,950.00, less than 10% of the entire loss amount. However, as to the remaining funds, Jackson has not identified any legitimate sources nor has he identified a source of income that could legitimize these funds. *Cf. United States v. Reasor*, 541 F.3d 366, 369 (5th Cir. 2008) ("If no relevant affidavits or other evidence is submitted to rebut the information contained in the PSR, the court is free to adopt its findings without further inquiry or explanation.") (internal quotation and citation omitted). Additionally, Jackson admitted to the arresting officer that he opened both Richman and Maxwell Accounts to receive transfers and deposits from various frauds and would keep a small portion for himself. Coupling these facts with the five victim interviews and Jackson's involvement vis-à-vis impersonating a solider, it is plausible that the total loss amount was derivative of fraudulent activity, especially considering that Jackson failed to submit rebuttal evidence legitimizing the funds. *See Reasor*, 541 F.3d at 369; *United States v. Huerta*, 182 F.3d 361, 364 (5th Cir. 1999) (holding that the defendant bears the burden of demonstrating that the PSR is inaccurate); *cf. United States v. Mateo Garza*,

541 F.3d 290, 293 (5th Cir. 2008) ("We will not upset these findings unless they are implausible in light of the record as a whole."). In turn, this cannot be considered a reversible error.

Accordingly, we affirm the district court's twelve-level enhancement under USSG § 2b1.1(b)(1)(G).

## C.

### The District Court Had Authority to Add Supervised Term.

The final issue relates to the district court's reconvening of parties to add the three-year supervised release term. According to Jackson, this resentencing is restricted under Rule 35(a). The Government considers this to be a technical error permissible under Rule 35. We agree, this was a correction of a technical error.

Because it is a question of law, we conduct a de novo review of whether the trial court "had authority to resentence a defendant pursuant to Rule 35(a)." *United States v. Ross*, 557 F.3d 237, 239 (5th Cir. 2009) (footnote omitted). Rule 35(a) permits the district court to correct a sentence resulting from "arithmetical, technical, or other clear error." FED. R. CRIM. P. 35(a). It is a "narrow authority" which "extends solely to cases in which an obvious error or mistake has occurred in the sentence, that is, errors which would almost certainly result in a remand of the case to the trial court for further action." *United States v. Olarte-Rojas*, 820 F.3d 798, 803–04 (5th Cir. 2016) (internal quotation marks and citation omitted). Accordingly, we have recently affirmed corrections in circumstances where the district court (1) "misspoke" and set the imprisonment term on the lower Guidelines range when the court previously stated it would sentence on the higher end; and (2) mistakenly used the wrong number in a Guidelines provision. *See, e.g.*, *United States v. Sanchez-Villarreal*, 857 F.3d 714, 718 (5th Cir. 2017); *Olarte-Rojas*, 820 F.3d at 803–06.

No. 19-20143

This case is no different than *Sanchez-Villarreal*. There, the defendant objected to the PSR's omittance of the mitigating role reduction. *Sanchez-Villarreal*, 857 F.3d at 717. He urged the court to apply such reduction because he was only a "mule" in this drug trafficking and did not coordinate the narcotic transportation. *Id.* At sentencing, the district court overruled his objection and made clear that such reduction would not be applied. *Id.* Nonetheless, the court orally pronounced a 135-month sentence, which is on the lower end of the Guidelines range. *Id.* "Several hours later . . . [the] court reconvened the sentencing hearing and the judge explained that she had misspoken [earlier] . . . and meant to sentence [the defendant] to 155 months' imprisonment." *Id.* On appeal, we affirmed the revision under Rule 35(a). We reasoned that the district court had implied it would impose a high-end sentence because it offered "no explanation [to] justify[] a downward variance" and stated it would not apply the requested reduction. *Id.* at 718. Moreover, after quickly recalling the matter, the trial court explained that it had "simply misspoken" earlier. *Id.* Because "it [was] facially apparent from the record that [the sentencing error] was an 'obvious error or mistake that almost certainly would result in a remand,'" we held that the court had the "authority to resentence." *Id.* (alterations in original) (citation omitted).

According to Jackson, *Sanchez-Villarreal* is distinct from this case because that trial court failed to explain the downward variance as mandated[5] and explicitly contradicted itself in sentencing the defendant to a lower term than originally indicated. Here, by contrast, a sentence with no supervised release is within the Guidelines range and is what the court imposed at the

---

[5] *Gall v. United States*, 552 U.S. 38, 46 (2007) ("It is also clear that a district judge must give serious consideration to the extent of any departure from the Guidelines and must explain his conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications.").

first hearing.  Jackson further argues that calling a second hearing to modify the sentence broke the sequence of events and violated Rule 35(a).  *Cf. United States v. Meza*, 620 F.3d 505, 508 (5th Cir. 2010) (affirming sentence revision that occurred at the "same hearing, on the same day, within moments of the original pronouncement" and stating that an "unbroken sequence of actions" is a "compelling factor").

Jackson's arguments in distinguishing *Sanchez-Villarreal* are unpersuasive and fail to consider the entirety of the record.  First, while the trial court had the discretion not to impose any supervised release, the record reflects that the court always intended to impose *some* term of supervised release.  Indeed, the district court explicitly stated each special condition for supervised release at the initial sentencing.  It would be illogical to discuss these conditions if the district court intended to impose no supervised release.  During the "continuation of the sentencing hearing," the trial court stated that it "forgot to announce the term of supervised release[]."  This is similar to the district court's comment in *Sanchez-Villarreal* that it "misspoke" during the initial sentencing.  857 F.3d at 718.  Moreover, while the second hearing was a break in events, the hearing reconvened within hours of the initial sentencing hearing, just as it did in *Sanchez-Villarreal.  Id.*  And in the second hearing, nothing suggests that "the district court 'reexamine[d] whether a guideline should be applied, reevaluate[d] the application of a guideline that was subject to interpretation, reconsider[ed] calculations made under the appropriate guidelines range, [sought] to alter the sentence because of a disagreement with a guideline, or reconsider[d] whether the sentence was a proper exercise of its discretion.'"  *Id.* (quoting *Olarte-Rojas*, 820 F.3d at 805) (alterations in original).  Therefore, while Jackson's sentence was modified at a second sentencing hearing, "it is facially apparent from the record that [the sentencing

error] was an 'obvious error or mistake that almost certainly would result in a remand.'" *Id.* (quoting *Olarte-Rojas*, 820 F.3d at 805) (alterations in original).

Accordingly, it was permissible under Rule 35(a) for the trial court to reconvene the sentencing hearing to impose the supervised-release term.

## III.

For the foregoing reasons, we AFFIRM the district court's judgment in its entirety.